[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 1, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12927

_____

Agency Nos. A79-494-655
A79-494-654

LIANA TAN,
I GUSTI NGURAH NESSY ELIARTA SUPRAJAPATA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(May 1, 2006)

Before DUBINA, MARCUS and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

The issue presented in this petition for review is whether the Immigration Judge gave reasoned consideration to the application for withholding of removal of Liana Tan, a native and citizen of Indonesia, who alleged that she had suffered past persecution on account of her race. Tan credibly testified that she had been a victim of a sexual assault by Muslim men who yelled racial slurs at her and harassed other persons of Chinese descent, and Tan presented both a Country Report prepared by the U.S. State Department and other evidence of persecution by Muslims against persons of Chinese descent in Indonesia. Tan and her husband, I Gusti Suprajapata, petition for review of a decision of the Board of Immigration Appeals, which affirmed an order of an Immigration Judge who found Tan and her husband removable because they failed to file timely applications for asylum and establish past persecution or a well-founded fear of future persecution for withholding of removal. Because we lack jurisdiction to review whether Tan timely filed her application for asylum, we dismiss that portion of her petition. Because the Immigration Judge, as affirmed by the Board of Immigration Appeals, failed to give reasoned consideration to Tan's petition and make adequate findings, we grant her petition for review, vacate the decision of the Immigration Judge, and remand for proceedings consistent with this opinion.

# I. BACKGROUND

Tan and her husband were admitted with F-1 student visas as non-immigrant visitors to the United States on February 7, 2000. On August 8, 2001, Tan filed an application for asylum and withholding of removal under the Immigration and Naturalization Act and the Convention Against Torture. Tan, who is Christian and of Chinese ethnicity, alleged that she and her family have been harassed by Muslim Indonesians based on religion and race. Tan alleged that, during her childhood, she lived in a Muslim neighborhood and was continually harrassed by Muslims who called her "Chinese hooker" when she took the bus and yelled "Wipe them out!" when she went to church.

In December 1998, Tan's family and other Christians assembled at her family home for Christmas services because Christian congregations often cannot obtain building permits to build churches. During the service, a group of Muslim vandals attacked the home with rocks, firecrackers, and human excrement. The Muslim vandals left after Tan's parents paid them money.

In November 1999, Tan was sexually assaulted and her friend was raped after they left a movie theatre. Tan testified that, when she and her friend arrived at the theatre in their car, they were approached by "Malay punks" who were Muslim. Tan and her friend refused the demand of the Muslim men for money.

The men also approached other Chinese patrons for money. According to Tan, Muslim men often approached ethnic Chinese women to ask for money. Tan testified that the men knew she was Christian because she was Chinese, and she knew they were Muslim because of their clothing and facial features. She and her friend moved the car before they went to see the movie.

After the movie, as the two women were leaving the parking lot in their car, several Muslim men appeared and approached cars with Chinese occupants. The two Muslim men who had approached Tan and her friend earlier in the evening broke Tan's car windows and entered her car. They threatened Tan with a knife and ordered her to drive under a bridge. The Muslim men beat the women until their lips were bleeding. The man who attacked Tan said, "This is payback time. Sometimes I win, and this time you lose! We are going to have some fun with you, Chinese whore!" One of the men twisted Tan's arm and kicked her in the knee to bring her to the ground. He then forced Tan to crawl as he fondled her buttocks and thigh. Tan offered the man her car, but he continued to assault Tan by kicking her in the stomach and sitting on her thighs to immobilize her. The man ripped off Tan's shirt and fondled her breasts. She screamed, but her attacker threatened that "you better behave yourself or you [will] be killed, Chinese dog." Tan managed to

4

free herself by kicking her attacker in the groin. She fled to an inhabited area to get help.

When she returned, Tan discovered that her friend had been raped and was unconscious. Tan took her friend to a hospital, and Tan was treated for scratches and bruises. Tan reported the incident to the police, who took a description of the attackers, but did not investigate the incident because Tan did not give them money. Her friend avoided Tan after the incident. Tan suffered from nightmares and emotional trauma as a result of the event.

When the Immigration Judge asked Tan why she was attacked, Tan responded, "I don't know, but what I know that they asked money to us [sic], and I didn't give . . . any money." When the Immigration Judge later asked how the Muslim men singled out which cars to harass, Tan responded, "I think the Chinese people that's [sic] being attacked, asked for money, in general the women" and explained that Muslim men attack Chinese women because of racial and religious differences.

In February 2000, Tan and her then-boyfriend, Suprajapata, obtained student visas to study in the United States. Tan's family remained in Indonesia, but their business was looted and damaged in May 2001. They hoped to flee to Singapore. Tan did not tell her boyfriend about the incident until Reverend Goesti Agung

5

Wijoyo, her pastor in the United States, convinced her that the incident was not her fault. Tan alleged that she did not initially file for asylum because of her shame about the sexual assault, but her pastor convinced her eventually to apply. Tan and Suprajapata married in the United States in 2001, and they then applied for asylum. Suprajapata relies on Tan's application.

Tan also included several documents about the ethnic and religious strife in Indonesia in her application for asylum: the 2000 Country Report on Human Rights Practices prepared by the U.S. State Department, family birth, marriage, and travel documents, and a U.S. State travel warning that described church bombings on Christmas Eve. She also submitted several articles that describe violence against Christians and ethnic Chinese. These articles describe riots, rapes of Chinese women, destruction of Christian churches, discriminatory practices against ethnic Chinese and Christians, and murders of Christians.

The Country Report stated that 85 percent of the population in Indonesia was Muslim. Although the Report stated that the new president, Abdurrahman Wahid, advocated tolerance and mutual respect, the Report stated that local leaders have been reluctant to protect minority rights. The Report stated that Muslims had burned churches all over the country because of religious and economic tensions between "poor Muslims and more affluent Sino-Indonesian Christians." The

Country Report also stated that Chinese are the largest minority, but Indonesia prohibits the operation of Chinese schools, formation of exclusively Chinese cultural groups or trade associations, public display of Chinese characters, and importation of Chinese-language newspapers. The Report also stated that Chinese-owned businesses have been attacked, and Chinese-Indonesians have been subject to discrimination and harassment.

Tan also submitted affidavits and letters about the trauma she experienced from the sexual assault. Letters from her siblings stated that Muslims often demand money from Chinese and described other discriminatory practices that target ethnic Chinese and Christians. A letter from Reverend Wijoyo of the Bethany Indonesia Church of God of Georgia stated that Tan had confided in him about the sexual assault.

The Immigration Judge denied Tan's application for asylum, withholding of removal, and relief under the Convention Against Torture. The Immigration Judge first concluded that Tan's application for asylum was untimely because it was filed more than one year after her arrival and Tan failed to establish "extraordinary circumstances." The Immigration Judge stated that he was not convinced that Tan's trauma from the sexual assault prevented her from filing for asylum because "she was able to get married during that period of time."

7

The Immigration Judge then considered whether Tan was entitled to withholding of removal because she had suffered past persecution. The Immigration Judge found Tan to be credible because Tan's "testimony seems to be consistent with her written application for asylum, what she told the interview officer when she had her asylum interview, and I don't see any material inconsistencies in her testimony." He stated, "Based on [my] observations of her, I have no doubt that she was attacked and that there was an attempted rape." The Immigration Judge then considered Tan's application for withholding of removal.

The Immigration Judge concluded that Tan had failed to establish that she suffered past persecution on a protected ground. The Immigration Judge stated that the attack was not based on Tan's race or religion because "almost 88 percent of Indonesians are Moslems. Therefore, the chances are about 8 in 10 or 9 in 10 that an attacker would be a Moslem. So that does not lead to the conclusion that the attack was based on any of the five protected grounds." He also based his conclusion on the fact that "her family, to include [sic] two sisters, continues to live in Indonesia without problem leads credence to the fact that this was more an incident of criminal violence as opposed to persecution."

The Immigration Judge also concluded that Tan failed to establish a well-founded fear of future persecution because of the ethnic demographics of

8

Indonesia.  The Immigration Judge stated, "somewhere in excess of 20 million people in Indonesia are Christians, and a great deal of them are ethnic Chinese. Therefore, based on the evidence that I have, I don't believe she would be singled out simply because she is Christian and of ethnic Chinese origin if she were to return to Indonesia."  The Immigration Judge also found that Tan failed to establish relief under the Convention Against Torture.

Tan appealed the decision of the Immigration Judge to the Board of Immigration Appeals, and the Board of Immigration Appeals affirmed the decision of the Immigration Judge without opinion.

## II. STANDARD OF REVIEW

When the BIA adopts the decision of the Immigration Judge without opinion, we review the decision of the Immigration Judge.  Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001).  We review subject matter jurisdiction de novo.  Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir. 2002).  We also review legal issues de novo, Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001), and "affirm the Board of Immigration Appeals' decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole," Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 544 U.S. __, 125 S. Ct. 2245 (2005).  We "view the record evidence in the

9

light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Id. "[F]indings of fact made by . . . the [Immigration Judge] may be reversed by this [C]ourt only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

"[T]he [Immigration Judge] must . . . consider all evidence introduced by the applicant." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005) (emphasis removed); see 8 C.F.R. § 1240.1(c) ("The immigration judge shall receive and consider material and relevant evidence . . . ."). "Where . . . the [Immigration Judge] has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented." Morales v. INS, 208 F.3d 323, 328 (1st Cir. 2000). The Immigration Judge must "consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Vergara-Molina v. INS, 956 F.2d 682, 685 (7th Cir. 1992) (quoting Becerra-Jimenez v. INS, 829 F.2d 996, 1000 (10th Cir. 1987)).

## III. DISCUSSION

Tan presents two arguments in her petition for review. First, Tan argues that the Immigration Judge erroneously concluded that Tan failed to establish "extraordinary circumstances" for her untimely application for asylum. Second, Tan argues that the Immigration Judge erroneously found that she failed to establish past persecution on a statutorily protected ground or a well-founded fear of future persecution for withholding of removal. We address each argument in turn.

### A. We Lack Jurisdiction to Review Tan's Application for Asylum.

Tan argues that the Immigration Judge erroneously concluded that she failed to establish "extraordinary circumstances" to excuse her untimely application for asylum. The government contends that we lack jurisdiction to consider Tan's petition. We agree with the government.

Section 1158(a)(2)(B) provides that an alien may apply for asylum if "the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). An alien may apply for asylum after one year of arrival if the alien "demonstrates . . . either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." Id. § 1158(a)(2)(D).

11

"No court shall have jurisdiction to review any determination" that an application was untimely or failed to establish changed or extraordinary circumstances to excuse the delay. Id. § 1158(a)(3). Because we lack jurisdiction to consider whether the Immigration Judge erroneously concluded that Tan failed to establish "extraordinary circumstances," we dismiss her petition for the review of the denial of her application for asylum.

### B. The Immigration Judge Failed to Make Adequate Findings About Whether Tan Is Entitled to Withholding of Removal.

To obtain withholding of removal, an applicant must establish that her "life or freedom would be threatened in that country because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "The alien bears the burden of demonstrating that it is 'more likely than not' she will be persecuted or tortured upon being returned to her country." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005) (quoting Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002)). This standard is more stringent than the "well-founded fear of future persecution" required for asylum. Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1324 n.2 (11th Cir. 2001).

An applicant for withholding of removal may satisfy her burden of proof in either of two ways. First, an alien may establish "past persecution in [her] country

12

based on a protected ground." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). If the applicant can show that the persecution was, at least in part, motivated by a protected ground, then the applicant can establish eligibility for withholding of removal. Borja v. INS, 175 F.3d 732, 735–36 (9th Cir. 1999) (en banc); see Osorio v. INS, 18 F.3d 1017, 1028 (2d Cir. 1994) (stating that persecution "does not mean persecution solely on account of" a statutorily protected ground); see also Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 438 (11th Cir. 2004) (citing Grava v. INS, 205 F.3d 1177, 1181 n.3d (9th Cir. 2000), with approval for the proposition that "mixed-motive persecution may qualify" as persecution based on a protected ground). If an alien establishes "past persecution," a rebuttable presumption arises that she has a "well-founded fear of future persecution," and the burden then shifts to the Department of Homeland Security to show that the conditions in the country have changed or the alien could avoid a future threat through relocation. Mendoza, 327 F.3d at 1287. Second, an alien is entitled to withholding of removal if she establishes "that it is more likely than not that [] she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country." 8 C.F.R. § 208.16(b)(2). "An alien cannot demonstrate that [she] more-likely-than-not would be persecuted on a protected ground if the

13

[Immigration Judge] finds that the alien could avoid a future threat by relocating to another part of [her] country." Mendoza, 327 F.3d at 1287.

Tan argues that the Immigration Judge erroneously concluded that she is not entitled to withholding of removal. Tan first argues that she established past persecution "through her detailed testimony describing the racial and religious insults used by her attackers." Tan argues alternatively that she established a well-founded fear of future persecution because "in the context of current day Indonesia, any reasonable person in [Tan's] situation, as a Christian and an ethnic Chinese, would fear persecution . . . ."

The Immigration Judge did not give "reasoned consideration" to Tan's application or make "adequate findings" for at least three reasons. Morales, 208 F.3d at 328. First, the Immigration Judge misstated the contents of the record. The Immigration Judge stated, "Evidence in this case consists of seven exhibits and the testimony of the lead Respondent [Tan]," but failed to include the Country Reports and the newspaper articles that attest to the widespread violence against Chinese and Christians. The Immigration Judge also erroneously stated that Tan's family "continues to live in Indonesia without problem[s]," although Tan stated in her application that her family business "had been totally looted and damaged during [a] recent riot." Because both statements by the Immigration Judge are

14

unsupported by the record, they undermine the conclusion that the Immigration Judge considered all the evidence. Although the Immigration Judge is not required to discuss every piece of evidence presented before him, see Morales, 208 F.3d at 328, the Immigration Judge is required to consider all the evidence submitted by the applicant. See Forgue, 401 F.3d at 1287.

Second, after the Immigration Judge found Tan's account of the sexual assault credible, the Immigration Judge failed to explain why he found that the attack was not based, at least in part, on Tan's race. The Immigration Judge stated that Tan's testimony "seems to be consistent with her application for asylum, what she told the interview officer when she had her asylum interview, and I don't see any material inconsistencies in her testimony." The Immigration Judge considered Tan's "demeanor while testifying, . . . the rationality, internal consistency, and inherent persuasiveness of her testimony," and the Immigration Judge found that he had "no reason to doubt [Tan's] credibility." The Immigration Judge stated, "I have no doubt that she was attacked and that there was an attempted rape." The Immigration Judge then found, without logical explanation, that the attack of Tan was not based on her race even though that finding was at odds with Tan's credible testimony.

15

Tan's testimony, "if credible, may be sufficient to sustain the burden of proof" for asylum or withholding of removal "without corroboration."   8 C.F.R. §§ 208.13(a), 208.16(b).  Tan testified that her attackers were Muslim men, and Muslim men often harass Chinese women.  She testified that on the night of the attack the Muslim men singled out only Chinese patrons at the theatre.  She also stated, in her application, that the Muslim men called her a "Chinese dog" and "Chinese whore" during the attack.  Tan testified that Tan offered to give her car to her attackers, but they ignored her offer.  The Immigration Judge neglected to reconcile his positive credibility finding and Tan's detailed testimony with the finding that Tan had not been persecuted, at least in part, based on her race.

Third, the reasons provided by the Immigration Judge for his findings are "unreasonable."  Adefemi, 386 F.3d at 1029.  The Immigration Judge stated that "the chances are about 8 in 10 or 9 in 10 that an attacker would be a Moslem,"  and explained, "the fact that her attackers were Moslem does not necessarily lead to the conclusion that she was singled out because of her ethnicity."  This reasoning was unresponsive to any argument reflected in the record.  Tan did not contend that the sexual assault was based on her race solely because her attackers were Muslim.

The Government reads the findings of the Immigration Judge to mean that the attack on Tan was a random criminal act, but the Immigration Judge did not

16

articulate that finding based on anything in the record. The closest the Immigration Judge came to making that finding was the following statement: "I am not convinced that she was attacked based on any of the five protected grounds as opposed to being attached [sic] because she happened to be out at night in a car with another woman." The racial slurs her attackers used, the ethnicity of the other patrons that the Muslim men harassed, and the undisputed documentary and testimonial evidence of discrimination against Chinese and other non-Muslims in Indonesia suggests that Tan was targeted, at least in part, based on her race, but the Immigration Judge provided no response to that inference.

The Immigration Judge failed to render a reasoned decision in consideration of Tan's credible testimony and other evidence she submitted. Because the findings of the Immigration Judge are inadequate, we are unable to review the denial of Tan's petition for withholding of removal. It is also unclear whether the Department of Homeland Security could establish that the conditions in Indonesia have changed or Tan could avoid a future threat through relocation, and the Immigration Judge did not address those issues. See Mendoza, 327 F.3d at 1287. We grant Tan's petition for review, vacate the decision of the Immigration Judge, and remand for further proceedings consistent with this opinion.

Because we conclude that the Immigration Judge failed to render a reasoned decision as to whether Tan suffered past persecution on a statutorily protected ground, we do not reach Tan's argument that the Immigration Judge, as affirmed by the BIA, erred when he concluded that Tan failed to establish a well-founded fear of future persecution.

## IV. CONCLUSION

Tan's petition for review of the denial of her application for asylum is **DISMISSED** for lack of jurisdiction.  As to Tan's petition for review of the denial of her application for withholding of removal, the Immigration Judge failed to give "reasoned consideration" or make "adequate findings."  Morales, 208 F.3d at 328. We **GRANT** Tan's petition for withholding of removal, **VACATE** the decision of the Immigration Judge, and **REMAND** for proceedings consistent with this opinion.